# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.: _____

SYLVIA JARAMILLO,
    Plaintiff,
v.

LEPRINO FOODS COMPANY, INC, a Colorado corporation,

    Defendant.

---

## CIVIL COMPLAINT AND JURY DEMAND

---

Plaintiff, by and through her undersigned attorney, for her Complaint against Defendant, alleges and states as follows:

## NATURE OF THE ACTION

1. This is an action for national origin or ethnicity discrimination, failure to promote, hostile work environment, disparate impact discrimination and retaliation in violation of Title VII if the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.,* as amended, and violations of the Americans with Disabilities Act, 42 U.S.C. § 12101, as amended by the ADA Amendments Act of 2008 ("ADAAA"), and corresponding provisions of the Colorado Anti-Discrimination Act ("CADA") C.R.S. § 24-34-401 *et. seq.* Plaintiff seeks compensatory and punitive damages, front pay and back pay, expert witness fees, reasonable attorney fees and court costs, and other relief.

2. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331 (Federal Question Jurisdiction) and 42 U.S.C. §1334 (Civil Rights Jurisdiction) and 42 U.S.C. §1367

     (Supplemental Jurisdiction).  Plaintiff's claims are based on Federal Law under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.,* as amended, the Americans with Disabilities Act, 42 U.S.C. § 12101, as amended by the ADA Amendments Act of 2008 ("ADAAA"), and State Law pursuant to the Colorado Civil Rights Act, C.R.S. § 24-34-401 *et seq.*

3. Plaintiff has complied with all conditions precedent to the filing of this Title VII and Americans with Disabilities Act claim.  A copy of the Right to Sue letter issued by the U. S. Equal Employment Opportunity Commission is attached hereto and incorporated herein by this reference. (Ex.1)

**PARTIES**

4. Plaintiff resides in the City of Greeley, County of Weld, Colorado.

5. Defendant is a large "white owned and operated" Colorado corporation in good standing, with a principal office located at 1830 West 38th Avenue, Denver, CO 80211, and whose cheese processing plant in question is located at 1302 1st Street, Greeley, CO 80631.

6. At all times relevant, upon information and belief Defendant is and has been operated by one of the World's richest and most powerful families–*viz*, the Leprinos.

7. At all times relevant, upon information and belief, Defendant is and has been the World's largest corporate producer of mozzarella cheese and related dairy based products, with plants and facilities throughout the Nation.

8. At all times relevant, upon information and belief, Defendant is, and has been, not only a large "white owned" corporation, but also a " white run" company, as well, with Caucasians and other non Hispanics holding almost all upper and middle management personnel, and most of the lower level managerial and supervisory level jobs, with most

9. minority or protected class employees working in lower level production type jobs.

9. At all times relevant, upon information and belief, to facilitate, maintain, and further its foregoing endemically discriminatory, white dominated and preferred corporate operations or business model, Defendant long utilized one or more patently and invidiously discriminatory employment applications until it was forced, by and through litigation brought against it therefor by the U.S. Department of Labor's Office of federal Contract Compliance Program, to cease and desist therefrom.

**GENERAL ALLEGATIONS**

10. Plaintiff was hired by Defendant on January 14, 2012.

11. Plaintiff had an extensive background in corporate manufacturing.

12. Although Plaintiff had been warned by a former employee, Sean Aguilar, that the Defendant had a culture of employment discrimination, Plaintiff nonetheless believed that she would not be discriminated against due to her years of manufacturing type work.

13. Plaintiff enjoyed the two weeks of orientation, and was excited and challenged by being part of a new plant.

14. Plaintiff was assigned to the Whey Department as a "membrane operator," a new and complex position in a "start-up" process, which everyone there was attempting to learn.

15. Plaintiff's supervisor was Yuki Sakai and her supervisor was Robert Floyd.

16. As early as the week after orientation, Plaintiff noticed that Robert Floyd was "talking down" to Plaintiff and the other new Hispanic employees, purportedly regarding their learning proficiency.

17. At all times, Plaintiff's job performance was outstanding, as evidenced by her nomination by her co-workers for the "Mike Leprino Award."

18. In October, 2013, Plaintiff was given the position of Membrane Specialist.

19. Although the position was not a promotion, and there was no salary increase, she was given substantially more responsibility.

20. In Defendant's other facilities, Plaintiff's new position required two employee to perform the job duties thereof.

21. Yet, inexplicably, Plaintiff was required to perform the job by herself.

22. When Plaintiff asked for help, two employees from another facility were sent to "train" her further for this position.

23. The two employees were men, who were astounded that Plaintiff was performing the job alone, and were surprised that her wages were so much lower than theirs.

24. When Plaintiff, a Hispanic, Mexican American dared to question her supervisor, Yuki Sakai regarding the difference in her pay versus the pay the two Caucasian men were receiving for performing the same job (or ½ of it), she never received a response.

25. On November 29, 2013, Plaintiff"s supervisor, Robert Floyd, targeted Plaintiff with regard to break time guidelines.  He came into the membrane room and told Plaintiff to go on break, and wrote down her time. She was the only Hispanic employee in the room that he accosted. When Plaintiff returned, he wrote down an incorrect or false return time and demanded that she sign that sheet.  She refused.

26. Because she refused to sign the false or erroneous break time sheet that he had prepared, he began threatening or intimidating her, and demanded that she go to his office with him. Plaintiff refused and went home.

27. From that incident forward, Plaintiff felt that, like others similarly situated, she was a target because of her national origin or ethnicity, and was retaliated against thereby and

by Defendant's other acts and omissions described herein.

28. Because she dared to question her non Hispanic supervisors and managers' disparates invidiously discriminatory, and retaliatory conduct directed at Hispanics and African Americans and not Caucasian employees, Plaintiff became a primary target thereof.

29. Plaintiff not only performed her job as a Membrane Specialist, but also trained new employees for the Whey Department, and was a team leader for membrane changes.

30. Yet, Plaintiff was singled out by Robert Floyd, who treated her far more harshly than he treated non-Hispanic employees.

31. On June 17, 2014, Plaintiff suffered a serious, disabling and impairing occupational injury to her shoulder and wrist due to the heavy lifting required in her Membrane Specialist position. She was taken to Defendant's contracted notorious and disreputable "comp doctor" clinic, "Work Well," which at the time was Defendant's designated occupational provider.

32. Defendant's "comp doctors" placed Plaintiff on certain restrictions, gave her a wrist brace, and had her attend 4 sessions of physical therapy.

33. Afterward, she was typically told to go back to work and to see her own doctor, because Defendant's "comp doctor" informed her, in accordance with an egregious pattern, practice, or custom in regard thereto, that her injury and health care needs weren't occupational in nature.

34. Plaintiff did as she was told, and returned to work in pain and discomfort, even though she was never released for work by Defendant's comp doctors.

35. During this period, certain Caucasian co-workers and supervisors, such as Carrie Rocco, Tara Klobuchar, and Felicia Deines, began belittling and spreading rumors about

Plaintiff.

36. For example, when Dorothy Maes, who had been trained by Plaintiff, asked to receive more training from Plaintiff, her Caucasian supervisor, Tara Klobuchar, and a Caucasian co-worker, Felicia Deines, falsely informed Maes that Plaintiff "did not know what the F---k she was doing." Maes is a Plaintiff in a similar case filed against Defendant in this Court.

37. Yet, Plaintiff had been successfully training new employees for two years and was considered a training "specialist," and they would not, and did not, say such things about any non Hispanic trainer.

38. Carrie Rocco's denigrating comments made to other employees were constantly being reported by them to Plaintiff, so Plaintiff followed the chain of command and spoke to her supervisor, Yuki, asking her to report these incidents to Defendant's Human Resources Department. Yet, Yuki did not do so, contrary to her duty in that regard.

39. However, when Carrie Rocco made a complaint to Yuki, such reporting action was quickly taken.

40. Other Hispanic employees and African American employees of the Defendant were subjected to similar discriminatory, abusive, and retaliatory treatment by Defendant, its agents, and employees.

41. Plaintiff objected to the "hostile workplace," and the degrading, demeaning and abusive behavior of Robert Floyd.

42. Defendant's supervisors and managers took advantage of Plaintiff because she was a hard worker, but even when she did a good job they would find some pretextual fault with her work.

43. Plaintiff knew that her wrist or upper extremity injury would worsen if she did not move to another job, so she began applying for other positions with Defendant.

44. Plaintiff applied for three different positions for which she as qualified. She applied for a team lead position, but was falsely told by Yuki that "she wasn't ready," even though Plaintiff was a team leader for membrane changes and had much more experience than the Caucasian employee who was given the job, in accordance with Defendant's longstanding "Caucasian preferred," "Hispanic deferred" promotional, supervisory, and managerial customs, patterns, and practices.

45. Plaintiff also applied for positions in the non-fat dry foods department and in the tool crib, but each of these positions was also predictably given to a Caucasian employee, in accordance therewith.

46. When Plaintiff was finally offered a position by Yuki, she quickly realized that it required as much heavy lifting as Plaintiff was currently performing, so she naturally turned down the position.

47. When Plaintiff did not take the offered position, Yuki demanded that the Plaintiff sign a document to that effect. Plaintiff refused and asked where did Defendant's employee policies and procedures state that an employee was required to sign such a document indicating that the employee had declined a position.

48. Both Celeste Cartier, the head production supervisor, and Tara Klobuchar, a team supervisor, had stated at different times that, "Hispanics do not know what they are doing," or words to that effect.

49. Defendant's policy required applicants for job positions to be interviewed, but Hispanic applicants were nonetheless not so interviewed, contrary thereto.

50. In November, 2014, Plaintiff's shoulder and wrist or upper extremity occupational injuries worsened, so she reported this to Defendant, as required.

51. Plaintiff was then taken to Banner Health Occupational Health, Defendant's newly designated occupational medical provider, where x-rays tests were performed, and Plaintiff was given physical restrictions.

52. On January 7, 2014, Plaintiff was told to go to the Human Resources office to speak with Lisa Prater.  When she arrived, AJ Jensen was present, as well.  Plaintiff was falsely informed that her restrictions could not be accommodated, and that she was being sent home without pay.

53. Plaintiff was told to leave immediately, and that she was not to go back on the production floor until further notice.

54. Plaintiff was also falsely informed that she had to obtain a doctor's slip eliminating all restrictions in order to work, further contrary to the ADA, as amended.

55. Defendant falsely contended that her occupational injuries in question were not work related, and therefore weren't subject to the Colorado Workers' Compensation Act.

56. Plaintiff was never offered any workplace accommodations, even though non Hispanic employees frequently were accommodated following their disabling injuries or impairments.

57. Instead, Plaintiff was compelled to apply for short term and long term disability since her "non-work related" injuries required one or more surgeries.

58. Even though Plaintiff needed surgery, there were jobs that she could perform the essential functions of, both before and after surgery, but she was never offered any manner of accommodation or work opportunity of any kind, and could still have trained

employees without any accommodation.

59. In fact, Defendant's worker's compensation doctor, Laura Caton, modified Plaintiff's restrictions to try to help her return to work. Yet, once again, Defendant's agents falsely informed Plaintiff that Defendant could not accommodate her restrictions.

60. Despite her years of employment with Defendant, Plaintiff was forced to wait at the entrance to the workplace for someone from Human Resources to come down to accompany her to the Human Resources Office when she needed to speak with someone there.

61. Plaintiff was off work for almost a year due to her injury and surgery. When she was finally released to work, she contacted Defendant's Human Resources, whereupon she was falsely informed that she would have to start all over again and apply anew for a position.

62. Although in order to have a job, Plaintiff would have complied with Defendant's demand, she was fortunate enough to receive an offer of employment where she would no longer have to endure the hostility and discriminatory behavior.

63. Due to Plaintiff's ethnicity, her supervisors and managers engaged in national origin related discrimination, abuse, harassment, and retaliation, which Defendant's agents, supervisors, management and employees allowed and condoned, in accordance with a longstanding pattern, practice, or custom, contrary to law and the Defendant's own policies and procedures.

64. At all times relevant, Defendant did nothing to attempt remediate the pervasively and overtly hostile, abusive, retaliatory and invidiously discriminatory work environment endured by Plaintiff and other similarly situated minority or protected class employees.

## FIRST CLAIM FOR RELIEF
(National Origin or Ethnicity Discrimination)

65. Plaintiff incorporates by this reference all preceding paragraphs, as if fully set forth herein.

66. Plaintiff and others similarly situated experienced un-remediated, overt, intentional, flagrant, offensive and invidious discrimination, abuse, and retaliation in the workplace.

67. Plaintiff had a good faith belief that the unlawful conduct was discriminatory and otherwise unlawful, and tried to protect herself from such further acts of ethnic discrimination by complaining to her supervisors, Yuki Sakai and Celeste Chartier, and to Lisa Prater, Defendant's Human Resources Director.  She is also a witness in support of Dorothy Maes similar allegations against Defendant in this Court.  Plaintiff thereby engaged in protected opposition to such discriminatory behavior and treatment.

68. Despite Plaintiff's requests for relief from such acts of national origin discrimination, abuse, and retaliation, Defendant, its agents, management, and employees did nothing to protect Plaintiff, her rights and/or protected interests in her employment.

69. As a direct and proximate result of the acts and omissions of Defendant, its management, agents and employees described herein, Plaintiff has suffered and incurred, or may reasonably be expected to suffer or incur, the following damages and other losses, or is otherwise entitled to recover: lost fringe benefits; front pay and back pay, compensatory damages  that include severe emotional anguish, upset, or distress; embarrassment or humiliation; loss or impairment of enjoyment of life; pain and suffering; damage to character or reputation, credit, creditworthiness; and such other damages as may be proven at trial, including incidental and consequential damages, plus interest, reasonable

attorney fees and court costs.

## SECOND CLAIM FOR RELIEF
(Violations of the ADA and the ADAAA)

70. Plaintiff incorporates by this reference all preceding paragraphs, as if fully set forth herein.

71. Despite Plaintiff's request for reasonable accommodations for her perceived or actual disabilities, Defendant, its agents and employees routinely denied Plaintiff's rights under the ADA/ADAAA in accordance with a pattern, practice, or custom.

72. Even when Defendant's contracted physician modified Plaintiff's restrictions, Defendant failed and refused to engage in any manner of "interactive process" with Plaintiff to determine an appropriate accommodation, in a manner contrary to Plaintiff's rights under the ADA/ADAAA.

73. As a direct, foreseeable, and proximate result of Defendant's acts and omissions, Plaintiff has suffered or incurred, and will likely continue to suffer or incur, such damages, injuries, and losses, as are described hereinabove and such other damages, injuries, and losses as may be proven at trial.

## THIRD CLAIM FOR RELIEF
(Hostile Work Environment)

74. Plaintiff incorporates by this reference all preceding paragraphs, as if fully set forth herein.

75. Plaintiff and others similarly situated endured an overtly and pervasively hostile, abusive, and invidiously discriminatory and retaliatory work environment that was steeped in racial and national origin or ethnicity animus. Due to her Hispanic or Mexican American national origin, ethnicity or ancestry, Plaintiff and others similarly situated were

victimized thereby, including with respect to the terms and conditions of her employment, which were accordingly adversely affected by such hostile, retaliatory, and endemically discriminatory and otherwise unlawful conduct.

76. Plaintiff complained about the discriminatory and retaliatory conduct to her supervisor, Yuki Sakai, to the head supervisor, Celeste Chartier, and to Lisa Prater, Defendant's Human Resources Director, Defendant, its agents, managers, and supervisors did nothing in response, thus permitting reasonable people to infer that the severe national origin or ethnicity discrimination, hostile work environment, retaliation and other forms of invidious discrimination and retaliation that permeated the workplace exhibited by said supervisors and co-workers was thereby condoned.

77. By allowing Plaintiff's mangers, supervisors and co-workers to engage in such offensive and pervasive discrimination without proper supervision, discipline or investigation of them, Defendant created, maintained, fostered, or furthered such an overtly hostile, abusive, discriminatory and retaliatory work environment, that so victimized Plaintiff and others similarly situated.

78. As a direct, foreseeable, and proximate result of Defendant's acts and omissions, Plaintiff has suffered or incurred, and will likely continue to suffer or incur, such damages and losses described hereinabove and such other damages and losses as may be proven at trial.

## FOURTH CLAIM FOR RELIEF
(Retaliation)

79. Plaintiff incorporates by this reference all preceding paragraphs, as if fully set forth herein.

80. Under the circumstances of this case, Plaintiff had a right to enter in to a contract for employment with Defendant with the reasonable expectation that she would be treated fairly and lawfully in a non-discriminatory manner and to not be subjected to retaliation for complaining about such workplace discrimination and other unlawful acts or omissions.

81. Plaintiff went to her supervisors and Defendant's Human Resources Department complaining and questioning the widespread national origin and disability discrimination and retaliation, including Defendant's acts in: passing over her applications for different jobs due to her national origin or ethnicity; failing and refusing to pay her wages commensurate with white male or non Hispanic employees performing the same job; and failing to attempt to accommodate her occupational injury or to even engage in any "interactive process" to determine an appropriate accommodation.

82. As a direct, foreseeable, and proximate result of Defendant's acts and omissions, Plaintiff has suffered or incurred, and will likely continue to suffer or incur, such damages and losses described hereinabove and such other damages and losses as may otherwise be proven at trial.

### FIFTH CLAIM FOR RELIEF
(Disparate Impact)

83. Plaintiff incorporates by this reference all preceding paragraphs, as if fully set forth herein.

84. At all times relevant, Defendant's employment practices have had a marked disparate impact upon its protected class employees, such as Plaintiff and others similarly situated, in the terms and conditions of their employment.

WHEREFORE, Plaintiff prays that the Court award Plaintiff all relief requested herein including: front pay and back pay; lost fringe benefits; compensatory and punitive damages, that include damages for severe emotional anguish, upset, or distress; embarrassment or humiliation, loss or impairment of enjoyment of life; pain and suffering; damage to reputation, credit or creditworthiness, and reputation or character; and for such other damages as may be proven at trial, including incidental and consequential damages, plus interest, reasonable attorney fees and court costs, as provided by 42 U.S.C §2000e, *et. seq.,* and other laws, and for such other relief as the Court deems consistent herewith.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED: May 2, 2016

                        Respectfully submitted,

                        */s/ Richard K. Blundell*
                        Richard K. Blundell, Esq.
                        Law Office of Richard K. Blundell
                        1233 8th Avenue
                        Greeley, CO 80631
                        Tel: (970) 356-8900
                        Fax: (970) 353-9977
                        Email: rick@rkblaw.net

Plaintiff's address:
Sylvia Jaramillo
503 Spruce Mountain Court
Windsor, Colorado 80550